**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X
FRANCESCA GEDEON *on behalf of herself,*
*individually, and on behalf of all others similarly-*
*situated*,

|  |  |
|---|---|
| Plaintiff, | **MEMORANDUM** **AND ORDER** |
| - against - | CV 19-6954 (JS) (AKT) |
| VALUCARE, INC., | |
| Defendant. | |

----------------------------------------------------------------X

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

I.    PRELIMINARY STATEMENT

Plaintiff Francesca Gedeon ("Plaintiff") commenced this putative collective and class

action on behalf of herself and all others similarly situated against Defendant Valucare, Inc.

("Defendant" or "Valucare") for violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C.

¶¶ 201 *et seq.*, and the New York Labor Law ("NYLL").  *See generally* Complaint ("Compl.")

[DE 1].  On behalf of herself and potential collective and/or class members, Plaintiff seeks to

recover for Defendant's alleged failure to pay minimum wages and overtime compensation,

failure to pay timely wages, spread of hours violations, and failure to furnish proper wage

statements and notices.  *See id.* ¶¶ 38.-87.  Plaintiff also alleges individual claims against the

Defendant for retaliation.  *See id.* ¶¶ 88-96.

Plaintiff has moved for conditional certification as a collective action and for court-

authorized notice pursuant to § 216(b) of the FLSA.  *See* Plaintiff's Memorandum of Law in

Support of Motion for Conditional Certification ("Pl.'s Mem.") [DE 27].  Defendant opposes

Plaintiff's motion, primarily arguing that Plaintiff has failed to demonstrate she is similarly

situated to the other potential members of the collective or that these employees were subject to a common unlawful policy or plan.  *See* Memorandum of Law in Opposition to Plaintiff's Motion for Conditional Collective Action Certification ("Def.'s Opp'n") [DE 31].  Plaintiff submitted a reply.  *See* Plaintiff's Reply Memorandum of Law ("Pl.'s Reply") [DE 30].  For the reasons that follow, Plaintiff's motion is GRANTED, in part, and DENIED, in part.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    *Complaint*

The following allegations are taken from Plaintiff's Complaint and are assumed to be true for purposes of the instant motion.  *See Islam v. LX Avenue Bagels, Inc.*, No. 18 Civ. 04895, 2019 WL 5198667, at *1 n.3 (S.D.N.Y. Sept. 30, 2019).  Defendant is a Long Island and Brooklyn-based home healthcare staffing agency.  *See* Compl. ¶ 2.  Defendant provides in-home healthcare services to its clients such as personal grooming, meal and errands preparation, house cleaning, general housekeeping, and other services.  *See id.* ¶ 15.  Plaintiff began working for Defendant on September 28, 2014 as a home health aide coordinator based in Defendant's Brooklyn location.  *Id.* ¶ 16.  At the time the Complaint was filed on December 11, 2019, Plaintiff remained employed by Defendant.  *See id.* ¶ 17.  Although Plaintiff primarily works at the Brooklyn location, she also periodically works at the Long Island location in Hempstead.  *Id.*

Plaintiff's primary duties as a home health aide coordinator consist of scheduling home health aides for Defendant's clients and resolving scheduling conflicts and staffing issues to ensure Defendant's clients are adequately cared for and supervised.  *Id.* ¶ 18.  Throughout Plaintiff's employment, "Defendant has scheduled and required Plaintiff to work, and Plaintiff has in fact worked and continues to work, five days per week, Monday through Friday,

beginning between 9:00 and 10:00 a.m. and ending between 5:00 and 6:00 p.m., for a total of

approximately forty hours per week." *Id.* ¶ 19. Although Plaintiff is supposed to receive a 30-

minute uninterrupted break during each of her shifts, her break is frequently interrupted and she

occasionally does not receive a break at all. *Id.*

Plaintiff has also been required to work "overnight on-call shifts." *Id.* ¶ 20.

> [E]ach Thursday and Friday and sometimes a third day, Plaintiff is
> required to work, and does work, an on-call shift beginning at the
> conclusion of her regular shift, between 5:00 or 6:00 p.m. until 9:00
> a.m. the following morning. Moreover, from September 28, 2014
> until on or about July 21, 2019, Defendant additionally required
> Plaintiff, every-other Sunday, to work a twenty-four-hour on-call
> shift from 9:00 a.m. Sunday morning until 9:00 a.m. Monday
> morning. Thereafter, from on or about July 22, 2019 through the
> present, Defendant has required Plaintiff to work this twenty-four-
> hour Sunday on-call shift at least once per month, and sometimes
> more.

*Id.* During these on-call shifts, Plaintiff receives hourly emails on the company cell phone

assigned to her by Defendant from its home health exchange. *Id.* ¶ 21. She is required to

telephonically verify a home health aide's attendance with patients and manually enter the aide's

time in and out in the exchange system and in the on-call log. *Id.* At the end of her weekday on-

call shifts, Plaintiff is also required to submit the completed report to various management

personnel at the end of her shift. *Id.* At the end of her weekend on-call shifts, Plaintiff must

submit the report to the on-call nurse and manager on duty at 9:30 a.m., 1:30 p.m., 4:30 p.m., and

8:30 p.m. *Id.* As such, Plaintiff works between 69.5 hours and 110.5 hours per week, depending

on how many on-call shifts Plaintiff is assigned. *See id.* ¶ 22.

Throughout her employment with Defendant, Plaintiff was paid at an hourly rate for her

regularly scheduled Monday through Friday shifts. *Id.* ¶ 23. Plaintiff's hourly rate has

periodically increased over the years, from $15.00 per hour to her current rate of $18.00. *Id.*

Although Defendant pays Plaintiff at her agreed-to hourly rate for most of the time she works

during regular shifts, Defendant "regularly deducts time that Plaintiff actually works from her weekly compensable time, including thirty minutes from each shift . . . regardless of whether Plaintiff in fact receives a thirty-minute uninterrupted break during that shift, as well as other random amounts of time as it sees fit and at its whim." *Id.* Plaintiff was compensated differently for her on-call shifts. *See id.* ¶ 24. Plaintiff has been paid a flat rate of $40.00 for each 16-hour weekday on-call shift, including Thursday and Friday nights. *Id.* From September 2014 to April 2019, Plaintiff was paid a flat rate between $80.00 and $97.50 for each 24-hour Sunday on-call shift. *Id.* Then, from May 2019 to the present, Defendant has been paying Plaintiff a flat rate between $120.00 and $153.00 for each 24-hour Sunday on-call shift. *Id.* Plaintiff claims Defendant has failed to pay Plaintiff her overtime rate "of one and one-half times her regular hourly rate, which has spanned from $22.50 to $27.75 . . . for any hours that Plaintiff has worked . . . in excess of 40 per week." *Id.* ¶ 25. Plaintiff also claims that Defendant has failed to pay her regular rate for all hours that she works up to 40 hours per week. *See id.* The Complaint then sets forth two schedules which Plaintiff was required to work and which support this claim. *See id.* ¶¶ 26-27.

> The first schedule Plaintiff set forth provides as follows:

> > Monday, July 10, 2017: 9:00 a.m. until 5:00 p.m.;
> > Tuesday, July 11, 2017: 9:30 a.m. until 5:30 p.m. and on-call from
> > 5:30 p.m. until 9:00 a.m. Wednesday morning;
> > Wednesday, July 12, 2017: 9:30 a.m. until 5:30 p.m.;
> > Thursday, July 13, 2017: 9:30 a.m. until 6:00 p.m. and on-call
> > from 6:00 p.m. until 9:00 a.m. Friday morning;
> > Friday, July 14, 2017: 9:30 a.m. until 6:00 p.m. and on-call from
> > 6:00 p.m. until 9:00 a.m. Saturday morning;
> > Saturday, July 15, 2017: off;
> > Sunday, July 16, 2017: on-call from 9:00 a.m. until 9:00 a.m.
> > Monday morning.

*Id.* ¶ 26. Plaintiff worked 110.50 hours during the week of July 10, 2017 and was paid a total of $672.65, comprised of $15.00 per hour for only the first 31.51 hours that she worked during regularly

scheduled shifts and $200 for her on-call shifts.  *Id.*  The second schedule provides that Plaintiff

worked the following hours:

> Monday, February 25, 2019: 9:50 a.m. until 5:10 p.m.;
> Tuesday, February 26, 2019: 9:07 a.m. until 5:30 p.m.;
> Wednesday, February 27, 2019: 9:45 a.m. until 5:10 p.m.;
> Thursday, February 28, 2019: 10:00 a.m. until 5:35 p.m. and on-
> call from 5:35 p.m. until 9:00 a.m. Friday morning;
> Friday, March 1, 2019: 9:00 a.m. until 5:43 p.m. and on-call from
> 5:43 p.m. until 9:00 a.m. Saturday morning;
> Saturday, March 2, 2019: off;
> Sunday, March 3, 2019: on-call from 9:00 a.m. until 9:00 a.m.
> Monday morning.

*Id.* ¶ 27.  For this particular week, Plaintiff worked a total of 94.13 hours and was paid a total of

$852.75, comprised of $18.50 per hour for the first 36.5 hours worked and $177.50 for the on-

call shifts.

Defendant pays Plaintiff on a weekly basis by check.  *Id.* ¶ 29.  On each occasion

Plaintiff is paid, Defendant has failed to provide Plaintiff with a wage statement that accurately

reflects the number of hours she worked, her regular hourly rate of pay, and her overtime rate of

pay for all hours in excess of 40.  *Id.* ¶ 30.  Plaintiff was also not provided with any wage notice

at the time she was hired.  *Id.* ¶ 31.

On February 27, 2019, Plaintiff notified various members of Valucare's management

personnel via email that, beginning March 13, 2019, Plaintiff was no longer able to work the 24-

hour Sunday on-call shifts because she had to find a second job.  *Id.* ¶ 35.  The next day,

Reginald Villier, an Administrator, responded to Plaintiff's email and informed her that her

request could not be accommodated and that she must continue to work that shift.  *Id.*  Plaintiff

sent a second email reiterating her need to take a second job to supplement her income.  *Id.*

Notwithstanding Plaintiff's request, she was scheduled to work a 24-hour on-call shift on

March 17, 2019.  *Id.* ¶ 36.  Two days prior to this shift, Plaintiff met with Paula Smith-Morrison,

5

her direct supervisor, and complained that she could not continue to work on-call shifts for a "mere flat rate . . . between $80.00 and $97.50, which was obviously below minimum wage and did not include overtime pay." *Id.* ¶¶ 35-36. After this meeting, Plaintiff sent another email to management personnel asking them to reconsider her request not to work 24-hour on-call shifts on Sundays because "it was grossly unfair for Defendant to force Plaintiff to choose between working these twenty-four-hour on-call shifts and supplementing her unlawful income through other employment." *Id.* ¶ 36. Plaintiff was again informed that the request was rejected. *Id.* Then, a few days later on March 18, 2019, Plaintiff was suspended without pay from March 20, 2019 through April 21, 2019. *See id.* ¶ 37.

### 2. *Plaintiff's Declaration in Support of the Motion for Conditional Certification*

In support of the motion for conditional certification, Plaintiff has submitted her own declaration, in which she attests under penalty of perjury to certain facts relevant to the instant motion. *See* Plaintiff Francesco Gedeon's Declaration in Support of Plaintiff's Motion for Conditional Certification ("Gedeon Decl.") [DE 29]. In her declaration, Plaintiff repeats many of the same facts pled in the Complaint regarding her own employment. *See id.* ¶¶ 1-12. However, Plaintiff also notes that the manner in which she was paid by Valucare is substantially similar to the way it has paid and continues to pay all of its home health aide coordinators. *Id.* ¶ 13. Plaintiff is aware of this information from her own personal observations and through conversations with Valucare's President Alex Villier, Owner Carmel Villier, and Administrator Reginald Villier. *Id.* Plaintiff recalls a March 2016 meeting that Valucare's Head of Finance, Jennifer Sheckleford, held with home health care coordinators in which coordinators were informed that their flat rate of pay was being increased from $35.00 to 40.00 for 16-hour weekday on-call shifts and from $75.00 to $80.00 for each 24-hour weekend on-call shift. *Id.*

¶ 14.  Plaintiff identified three other home health coordinators who were present at that meeting: Ann Mary Scott, Angie Sonia Vastin, and Chris Joseph.  *Id.*  In addition to these three individuals, Plaintiff has also identified four other home health aide coordinators who performed similar or the same duties as Plaintiff:  "Ai Wei Lin, Nurli [Last Name Unknown], Chelina [Last Name Unknown], and Mirelle [Last Name Unknown]." *Id.* ¶ 17.  Plaintiff personally observed these individuals working the same scheduled hours per week as her, working through lunch breaks, and performing the same or similar tasks as she did.  *Id.*  Plaintiff also spoke to Ann Mary Scott and Angie Sonia Vastin, who informed Plaintiff that they worked overnight on-call shifts that were approximately the same length as Plaintiff's and involved the same duties, were paid a flat rate for weekend on-call shifts which did not include overtime compensation, and had random amounts of time deducted from their weekly compensable time.  *Id.*  Lastly, Plaintiff notes that both of Valucare's locations contain a conference room where notice of this lawsuit can be posted, and that the home health aide coordinators have meetings twice per day in these rooms.  *Id.* ¶ 19.

### B.    Procedural Background

Plaintiff commenced the instant action against Valucare on December 11, 2019.  *See generally* Compl.  Valucare filed its Answer on February 18, 2020.  *See* Answer ("Ans.") [DE 16].  The Court held an Initial Conference on February 19, 2020 and implemented a discovery schedule.  *See* February 19, 2020 Civil Conference Minute Order [DE 17].  Plaintiff filed a letter motion for conditional certification of a collective action on March 9, 2020.  *See* DE 19.  Judge Seybert referred Plaintiff's motion to this Court for a Report and Recommendation as to whether the motion should be granted.  *See* Judge Seybert's March 9, 2020 Electronic Order. The same day that the motion was filed, this Court terminated the motion without prejudice and

returned it to counsel because the motion should be made formally, on notice, under the Federal

Rules. *See* Magistrate Judge Tomlinson's March 9, 2020 Electronic Order. The Court also

directed the parties to submit a proposed briefing schedule for the motion by March 13, 2020.

*Id.* The parties complied with this directive and submitted a briefing schedule that was "so

ordered" by the Court on March 16, 2020. *See* DE 24; DE 25.

The instant motion for conditional certification of a collective action was filed on May 4,

2020. *See generally* Notice of Plaintiff Francesca Gedeon's Motion for Conditional Certification

("Notice of Mot.") [DE 26]; Pl.'s Mem.; Declaration of Danielle E. Mietus, Esq. in Support of

Plaintiff Francesca Gedeon's Motion for Conditional Certification [DE 28]; Proposed Notice of

Pendency and Opt-in Form ("Notice of Pendency") [DE 28-4]; Proposed Notice of Pendency

Reminder [DE 28-5]; Proposed Email Notice of Lawsuit [DE 28-6]; Proposed Text Message

Notice of Lawsuit [DE 28-7]; Gedeon Decl. Defendant's opposition to Plaintiff's motion

includes a memorandum of law, an Affidavit by Valucare's Administrator, Reginald Villier, and

a compensation report for Plaintiff for the period of November 14, 2016 and October 29, 2017.

*See generally* Def.'s Opp'n; Affidavit of Reginald Villier ("Villier Aff.") [DE 31-1];

Compensation Report [DE 31-2]. Plaintiff submitted a reply. *See generally* Pl.'s Reply.

On July 16, 2020, Judge Seybert modified her March 9, 2020 Electronic Order and

referred Plaintiff's motion to the Court for decision instead of a Report and Recommendation.

*See* July 16, 2020 Electronic Order.

## III.   <u>APPLICABLE LAW</u>

### A.   **Legal Standard for Conditional Certification**

The FLSA provides, in pertinent part, as follows:

> Any employer who violates the provisions of section 206 or section
> 207 of this title shall be liable to the employee or employees affected
> in the amount of their unpaid minimum wages, or their unpaid

8

> overtime compensation, as the case may be, and in an additional
> equal amount as liquidated damages. . . . An action to recover . . .
> may be maintained against any employer (including a public
> agency) in any Federal or State court of competent jurisdiction by
> any one or more employees for and in behalf of himself or
> themselves and other employees similarly situated. No employee
> shall be a party plaintiff to any such action unless he gives his
> consent in writing to become such a party and such consent is filed
> in the court in which such action is brought.

29 U.S.C. § 216(b). Section 216(b) provides an employee with a private right of action to recover overtime compensation and/or minimum wages. *Id*.; *see also Cabrera v. Stephens*, No. 16-CV-3234, 2017 WL 4326511, at *4 (E.D.N.Y. Sept. 28, 2017) (citing *Bifulco v. Mortg. Zone, Inc*., 262 F.R.D. 209, 212 (E.D.N.Y. 2009)) ("The FLSA provides a private right of action to recover unpaid overtime compensation and/or minimum wages."); *Moore v. Eagle Sanitation, Inc.*, 276 F.R.D. 54, 57 (E.D.N.Y. 2011) (citing 29 U.S.C. § 216(b)); *Gjurovich v. Emmanuel's Marketplace, Inc*., 282 F. Supp. 2d 101, 103 (S.D.N.Y. 2003) (quoting *Hoffmann v. Sbarro, Inc*., 982 F. Supp. 249, 260 (S.D.N.Y. 1997)). "Although the FLSA does not contain a class certification requirement, such orders are often referred to in terms of 'certifying a class.'" *Bifulco*, 262 F.R.D. at 212 (quoting *Parks v. Dick's Sporting Goods, Inc.*, No. 05-CV-6590, 2007 WL 913927, at *3 (W.D.N.Y. Mar. 23, 2007)).

Courts within the Second Circuit apply a two-step analysis to determine whether an action should be certified as an FLSA collective action. *See Myers v. Hertz Corp.*, 624 F.3d 537, 544–45 (2d Cir. 2010) (noting that district courts within this Circuit have "coalesced around a two-step method" for analyzing collective action certification). First, the court determines whether the proposed collective members are "similarly situated." *Puglisi v. TD Bank, N.A.*, 998 F. Supp. 2d 95, 99 (E.D.N.Y. 2014) (quoting *Kalloo v. Unlimited Mech. Co. of NY, Inc.*, 908 F. Supp. 2d 344, 346 (E.D.N.Y. 2012)); *see also McGlone v. Contract Callers, Inc.*, 867 F. Supp.

2d 438, 442 (S.D.N.Y. 2012) (quoting *Myers*, 624 F.3d at 555). If the court decides in the affirmative, then the proposed collective members must consent in writing to be bound by the result of the suit, or "opt-in." *McGlone,* 867 F. Supp. 2d at 442 (citing *Cunningham v. Elec. Data Sys. Corp.*, 754 F. Supp. 2d 638, 644 (S.D.N.Y. 2010)); *see also* 29 U.S.C. § 216(b). The second step, which typically occurs after the completion of discovery, requires the court to make factual findings whether the class members are actually similarly situated. *Rosario v. Valentine Ave. Discount Store, Co.*, 828 F. Supp. 2d 508, 514 (E.D.N.Y. 2011) (quoting *Lynch v. United Servs. Auto. Ass'n*, 491 F. Supp. 2d 357, 368 (S.D.N.Y. 2007)); *see also Sharma v. Burberry Ltd.*, 52 F. Supp. 3d 443, 451 (E.D.N.Y. 2014); *Thornburn v. Door Pro America*, No. 16-CV-3839, 2018 WL 1413455, at *5 (E.D.N.Y. Mar. 20, 2018). "At that juncture, the court examines the evidentiary record to determine whether the 'opt-in' plaintiffs are, in fact, similarly situated to the named plaintiff." *Bifulco*, 262 F.R.D. at 212 (quoting *Hens v. ClientLogic Operating Corp.*, No. 05-381S, 2006 WL 2795620, at *4 (W.D.N.Y. Sept. 26, 2006)).

The instant motion concerns only the first step—whether the proposed opt-in members are "similarly situated" such that conditional certification should be granted. At this stage, "the evidentiary standard is lenient," *Bifulco*, 262 F.R.D. at 212 (quoting *Rubery v. Buth-Na-Bodhaige, Inc.*, 569 F. Supp. 2d 334, 336 (W.D.N.Y. Aug. 8, 2008)), and plaintiffs need only "make a 'modest factual showing' that they and potential opt-in plaintiffs 'together were victims of a common policy or plan that violated the law.'" *Myers*, 624 F.3d at 555 (quoting *Hoffmann*, 982 F. Supp. at 261); *see also Doucoure v. Matlyn Food, Inc.*, 554 F. Supp. 2d 369, 372 (E.D.N.Y. 2008); *Perez v. Allstate Ins. Co*., No. 11-CV-1812, 2014 WL 4635745, at *5 (E.D.N.Y. Sept. 16, 2014); *Trinidad v. Pret A Manger (USA) Ltd.*, 962 F. Supp. 2d 545, 552 (S.D.N.Y. 2013). "[T]he key question for the similarly situated inquiry is not whether plaintiff's

job duties are identical to other potential opt-in plaintiffs, but rather, whether the proposed

plaintiffs are similarly situated . . . with respect to their allegations that the law has been

violated." *Knox v. John Varvatos Enterprises Inc.*, 282 F. Supp. 3d 644, 656 (S.D.N.Y. 2017)

(internal quotations and citations omitted). Therefore, when "plaintiffs attest that they regularly

worked in excess of [ ] 40 hours per week and worked evenings, early mornings, and weekends

without being properly paid . . . [s]uch attestations . . . are sufficient for the purposes of

[conditional certification]." *Bifulco*, 262 F.R.D. at 214 (internal citation omitted); *see also*

*Agonath v. Interstate Home Loans Ctr., Inc.*, No. 17-CV-5267, 2019 WL 1060627, at *2

(E.D.N.Y. Mar. 6, 2019). "In making this showing, 'nothing more than substantial allegations

that the putative class members were together the victims of a single decision, policy or plan' is

required." *Sexton v. Franklin First Fin., Ltd.*, No. 08-CV-4950, 2009 WL 1706535, at *3

(E.D.N.Y. June 16, 2009) (quoting *Scholtisek v. Eldre Corp.*, 229 F.R.D. 381, 387 (W.D.N.Y.

2005)). Moreover, courts have repeatedly stated that Section 216(b)'s "similarly situated"

requirement is "considerably less stringent" than the requirements for class certification under

Federal Rule of Civil Procedure 23 and "that a party seeking to maintain a collective action need

not meet the requirements of Rule 23 for class certification." *Rodolico v. Unisys Corp.*, 199

F.R.D. 468, 481 (E.D.N.Y. 2001) (collecting cases); *see also Dilonez v. Fox Linen Serv., Inc.*, 35

F. Supp. 3d 247, 252 (E.D.N.Y. 2014) (stating that a collective action under the FLSA "is

different than a typical class action under the Federal Rules of Civil Procedure, the strict

requirements of which—numerosity, commonality, typicality, and adequate representation— do

not apply to a collective action").

     At the initial certification stage, courts do not require proof of an actual FLSA violation,

but rather require the existence of a "'factual nexus' [ ] between the plaintiff's situation and the

situation of other potential plaintiffs." *Sobczak v. AWL Indus., Inc.*, 540 F. Supp. 2d 354, 362 (E.D.N.Y. 2007) (quoting *Wraga v. Marble Lite, Inc.*, No. 05-CV-5038, 2006 WL 2443554, at *1 (E.D.N.Y. Aug. 22, 2006)); *see also Fa Ting Wang v. Empire State Auto Corp.*, No. 14-CV-1491, 2015 WL 4603117, at *6 (E.D.N.Y. 2015); *Calderon v. King Umberto, Inc.*, 892 F. Supp. 2d 456, 459 (E.D.N.Y. 2012). This determination is typically based on the pleadings, affidavits, and declarations submitted by the plaintiff or plaintiffs. *See Fa Ting Wang*, 2015 WL 4603117, at *5–6; *Brabham v. Mega Tempering & Glass Corp.*, No. 13-CV-0054, 2013 WL 3357722, at *3 (E.D.N.Y. July 3, 2013); *Robles v. Liberty Rest. Supply Corp.*, No. 12-CV-5021, 2013 WL 6684954, at *5 (E.D.N.Y. Dec. 18, 2013).

"Although plaintiff's 'burden of proof is low, it is not non-existent—certification is not automatic.'" *Elamrani v. Henry Limousine, Ltd.*, No. 15-CV-2050, 2016 WL 5477590, at *4 (E.D.N.Y. Sept. 28, 2016) (quoting *Sanchez v. JMP Ventures, L.L.C.*, No. 13-CV-7264, 2014 WL 465542, at *1 (S.D.N.Y. 2014)). As the Second Circuit has explained, "[t]he 'modest factual showing' cannot be satisfied simply by 'unsupported assertions.'" *Myers*, 624 F.3d at 555 (quoting *Dybach v. State of Fla. Dep't of Corrections*, 942 F.2d 1562, 1567 (11th Cir. 1991)); *see also Morales v. Plantworks, Inc.*, No. 05-CV-2349, 2006 WL 278154, at *3 (S.D.N.Y. Feb. 2, 2006) (stating that "conclusory allegations are not enough" to meet the "modest factual showing" at the first stage of collective action certification).

The standard of proof, however, should still remain "low . . . because the purpose of this first stage is merely to determine *whether* 'similarly situated' plaintiffs do in fact exist." *Myers*, 624 F.3d at 555 (citing *Hoffman*, 982 F. Supp. at 261) (emphasis in original); *see Trinidad*, 962 F. Supp. 2d at 553 (quoting the same). With this in mind, courts have found that the allegations in the pleadings and the "personal observations of one plaintiff's affidavit" are "sufficient to

make the modest factual showing necessary to conditionally certify" a collective. *Hernandez v. NGM Mgmt. Grp. LLC*, No. 12-CV-7795, 2013 WL 5303766, at *3 (S.D.N.Y. Sept. 20, 2013) (collecting cases); *see also Shillingford v. Astra Home Care, Inc.*, No. 16-CV-6785, 2018 WL 1033243, at *3 (S.D.N.Y. Feb. 23, 2018) ("Accordingly, an FLSA collective action may be conditionally certified upon even a single plaintiff's affidavit.") (citation omitted); *Cabrera v. Stephens*, No. 16-CV-3234, 2017 WL 4326511, at *5 (E.D.N.Y. Sept. 28, 2017) ("Conditional certification is regularly granted based upon a complaint and one or two affidavits that collectively demonstrate the requisite nexus.") (citation omitted); *Bhumithanarn v. 22 Noodle Mkt. Corp.*, No. 14-CV-2625, 2015 WL 4240985, at *3 (S.D.N.Y. July 13, 2015) (finding that the allegations in the complaint and the affidavit of one named plaintiff "met the minimal burden at this preliminary stage of demonstrating that [the plaintiffs] were subject to a common policy or practice and were 'similarly situated' to one another and to potential opt-in plaintiffs").

## IV.  DISCUSSION

### A.  Conditional Certification

Plaintiff seeks conditional certification of a collective that includes "current and former employees who worked for Defendant as home health aide coordinators at any time between December 11, 2013 and the present." *See* Notice of Pendency at 1.[1]  Plaintiff argues that she and potential collective members are similarly situated because they were subjected to Defendant's

---

[1]        The proposed collective as alleged in the Complaint includes:

> All current or former employees, who during the applicable FLSA limitations period, worked for Defendant as home health aide coordinators, and who consent to file a claim to recover damages for unpaid overtime compensation and minimum wages, as well as liquidated damages that are legally due to them ("FLSA Plaintiffs").

*See* Compl. ¶ 12.

common policy of paying its home health aide coordinators a flat rate for hours worked in excess of 40 and not at time and one-half their regular rate, which is a rate that falls below even the minimum wage due to the number of hours that home health aide coordinators are required to work. *See* Pl.'s Mem at 14-15. In her Declaration, Plaintiff identifies seven other individuals currently or previously employed by Defendant as home health aide coordinators. *See* Gedeon Decl. ¶¶ 14, 17. Based upon conversations Plaintiff has had with some of these individuals, including Ms. Scott and Ms. Vastin, Plaintiff knows that they performed substantially similar duties and were paid flat rates for on-call shifts -- compensation for which fell below minimum wage and did not include overtime pay. *See id.* ¶ 17. Having reviewed the Complaint and Plaintiff's Declaration, the Court finds that Plaintiff has made the "modest factual showing" necessary to demonstrate that home health aide coordinators were similarly situated "victims of a common policy or plan that violated the law." *Myers*, 624 F.3d at 555.

Plaintiff has attested to facts which are sufficient to allege that she was subject to an unlawful policy by which Defendant deducted from her weekly compensable time (1) 30 minutes for lunch breaks regardless of whether the lunch break was uninterrupted and (2) other random amounts of time. *See* Gedeon Decl. ¶ 10. Plaintiff has also sworn to the fact that she was subjected to an unlawful policy by which Defendant did not pay her overtime wages for work performed during on-call shifts. *See id.* ¶ 11. Plaintiff works from 9 a.m. or 10 a.m. to 5 p.m. or 6 p.m. on Monday through Friday. *Id.* ¶ 6. In addition to those regularly scheduled hours, Plaintiff is also required to work overnight on-call shifts every Thursday and Friday (and sometimes a third day) which begin at the end of her regular shift at 5 p.m. or 6 p.m. and continue until 9 a.m. the next morning. *Id.* ¶ 7. Plaintiff was also required to work a 24-hour on-call shift every other Sunday beginning at 9 a.m. and continuing to 9 a.m. Monday. *Id.*

14

Plaintiff was required to work these Sunday on-call shifts from September 28, 2014 through July 21, 2019. *Id.* From the beginning of her employment and up through March 2016, Plaintiff was paid "a flat rate of $35.00 for each sixteen-hour weekday on-call shift, include[ing] those on Thursday night[s] and Friday night[s]." *Id.* ¶ 11. Then, from April 2016 to the present, Defendant only paid Plaintiff "a flat rate of $40.00 for each sixteen-hour weekday on-call shift." *Id.* For the 24-hour Sunday on-call shifts, Plaintiff was paid a flat rate of $75.00 from September 24, 2014 through March 2016 which increased to $80.00 and then $97.50 from April 2016 to April 2019. That rate was increased a second time to $120.00 and $153.00 in May 2019. *See id.* At this preliminary stage, these facts sufficiently allege that Plaintiff was subject to a policy in which she did not receive overtime compensation in violation of the FLSA. Further, based on this information, the Court "may infer" that other home health aide coordinators "worked similar shifts for comparable pay, thereby suffering the same violations of the FLSA." *Genxiang Zhang v. Hiro Sushi at Ollie's Inc.*, No. 17-CV-7066 2019 WL 699179, at *8 (S.D.N.Y. Feb. 5, 2019). The inference is also supported by Plaintiff's identification of some of these individuals, the manner in which they were paid, and specifically Defendant's failure to pay them overtime compensation.

Second, the Court finds that Plaintiff's Declaration also sufficiently alleges a common policy or practice by which Defendant required other home health aide coordinators to work in excess of 40 hours per week without paying them overtime as required by the FLSA. Such practice consequently resulted in their weekly compensation falling below the minimum wage. The factual nexus between Plaintiff's situation and that of the putative collective is the heart of the Court's analysis when determining whether to conditionally certify a collective action. *See Sobczak,* 540 F. Supp. 2d at 362 (finding that a named plaintiff is not required to show "an actual

FLSA violation" at this stage, but rather only that "a 'factual nexus' exists between the plaintiff's situation and the situation of other potential plaintiffs" (quoting *Wraga,* 2006 WL 2443554, at *1)).  Based on personal observations and conversations she had with her coworkers and management personnel, Plaintiff identifies seven employees working as home health aide coordinators who also worked in excess of 40 hours per week but were not paid overtime wages for on-call shifts and had hours randomly deducted from their weekly compensable time.  *See* Gedeon Decl. ¶¶ 13-17.

"Courts in this Circuit have commonly authorized the sending of collective action notices where plaintiff includes some probative information regarding similarly situated employees such as their names, their duties and their hours worked or where plaintiff provides affidavits from such employees setting forth the pertinent facts."  *Qing Gu v. T.C. Chikurin, Inc.*, No. 13-CV-2322, 2014 WL 1515877, at *3 (E.D.N.Y. Apr. 17, 2014); *see also Silva*, 2013 WL 6330848, at *3 (collecting cases); *Zhang*, 2013 WL 1729274, at *4.  "When plaintiffs base their assertions regarding similarly situated employees upon their own observations and conversations with other employees, courts have required details about these observations and conversations, such as where and when they occurred and the names of the employees involved."  *Benavides v. Serenity Spa NY Inc.*, 166 F. Supp. 3d 474, 481–82 (S.D.N.Y. 2016); *see also Sanchez*, 2014 WL 465542, at *2 ("Where or when these observations or conversations occurred . . . is critical in order for the Court to determine the appropriate scope of the proposed class and notice process"; otherwise "the Court is left with a list of generalized allegations . . . precisely the kind of unsupported assertions and conclusory allegations that courts in this District have found to be insufficient."); *Qing Gu*, 2014 WL 1515877, at *3 (denying conditional collective action certification where plaintiffs made "only general allegations . . . fail[ed] to provide any factual

detail about the other employees, such as names of fellow employees whom they observed or with whom and when they had conversations," did not "identify the job titles or duties performed by their fellow employees" and "did not specify to which location their observations pertained'"). Moreover, the fact that a plaintiff's "allegations may be based on hearsay does not diminish their value" for the purposes of establishing that other similarly situated potential plaintiffs exist. *Jeong Woo Kim*, 985 F. Supp. 2d at 448–49 (granting conditional certification where the plaintiff's affidavit relied "not only on his own observations, but on statements made by other potential opt-in plaintiffs, who allegedly told [the plaintiff] that they . . . never received overtime compensation").

Here, Plaintiff provides sufficient detail to enable the Court to conclude that she is similarly situated to other potential members of a collective that encompasses home health aide coordinators. Plaintiff's Declaration includes details regarding conversations that she has had with other home health aide coordinators whom Plaintiff has identified by name. *See* Gedeon Decl. ¶¶ 17. Plaintiff also recounts a specific meeting in May 2016 during which Valucare's management personnel advised Plaintiff and other home health aide coordinators, including Ms. Scott, Ms. Vastin, and Mr. Joseph, that Defendant would be increasing the flat-rate of pay for weekday and weekend on-call shifts. *Id.* ¶ 14. Plaintiff confirmed that home health aide coordinators were compensated in this manner in a March 2019 conversation with her direct supervisor. *Id.* ¶ 15.

Defendant argues that Plaintiff has failed to provide actual evidence to demonstrate she and potential opt-ins are similarly situated because "[t]he only evidence presented in support of Plaintiff's application is her self-serving Declaration." *See* Def.'s Opp'n at 4. Defendant further argues that "[t]he document is replete with factual inaccuracies and inadmissible hearsay that are

rebutted by documentary evidence." *See id.* at 4-5.  The only argument Defendant advances

against conditional certification therefore relates to issues of fact, matters which are beyond the

Court's review in analyzing such a motion.  At this preliminary certification stage, "the court

does not resolve factual disputes, decide ultimate issues on the merits or make credibility

determinations." *Lynch,* 491 F. Supp. 2d at 368 (S.D.N.Y. 2007) (citation omitted).

At the July 9, 2020 conference, the Court raised this problem with Defendant's counsel

and, during that conference, afforded Defendant an opportunity to raise an argument beyond any

factual disputes mentioned in its opposition papers.  *See* July 9, 2020 Civil Conference Minute

Order [DE 34] at ¶ 7.  Defendant's counsel was unable to do so.  *See id.*  Moreover, the fact that

a plaintiff's "allegations may be based on hearsay does not diminish their value" for the purposes

of establishing that other similarly situated potential plaintiffs exist.  *Jeong Woo Kim*, 985 F.

Supp. 2d at 448-49 (granting conditional certification where the plaintiff's affidavit relied "not

only on his own observations, but on statements made by other potential opt-in plaintiffs, who

allegedly told [the plaintiff] that they . . . never received overtime compensation").

The Court finds that the totality of factual allegations contained in Plaintiff's Affidavit are

sufficient to establish a factual nexus between Plaintiff's situation and that of other home health

aide coordinators such that they are similarly situated victims of a common policy or plan to

deny overtime compensation and minimum wages.  *See Islam*, 2019 WL 5198667, at *6

(granting conditional certification based on the two plaintiffs' declarations which identified more

than ten other employees and attested to the defendant's common policy of not paying minimum

wages or overtime compensation being applied to those other employees); *Liping Dai v. Lychee

House, Inc.*, No. 17-CV-6197, 2018 WL 4360772, at *8 (S.D.N.Y. Aug. 29, 2018) (granting

conditional certification based on the plaintiff's observations and conversations with his

coworkers who worked in excess of 40 hours and were compensated a fixed rate regardless of

the hours worked); *Gjurovich,* 282 F. Supp. 2d at 96 (granting conditional certification where

plaintiff's declaration "identified by name a number of current or former . . . employees who

held the same or similar positions as the Plaintiff . . . who, like Plaintiff, were paid a fixed

weekly salary, and may not have received overtime compensation if he or she worked in excess

of forty hours each week").

### B.    The Notice of Pendency

#### 1.    *Notice Period*

The FLSA has a two-year statute of limitations, except in the case of willful violations for

which the statute of limitations is three years. *See* 29 U.S.C. § 255(a). NYLL claims are subject

to a six-year statute of limitations. *See* N.Y. Lab. L. § 198(3). Plaintiff seeks to send notice to

potential opt-ins who were employed by Defendant during the six-year period preceding the

filing of the Complaint, from December 11, 2013 to the present. *See* Pl.'s Mem. at 17-18.

Defendant opposes, arguing that the notice period should be limited to three years. *See* Def.'s

Opp'n at 5-6.

"When plaintiffs bring NYLL claims alongside FLSA claims, courts in this Circuit are

split as to whether the notice period should be six years, based on the NYLL's limitations period,

or three years, based on the FLSA's limitations period for willful violations." *Rosa v. Dhillon*,

No. 20-cv-3672, 2020 WL 7343071, at *8 (E.D.N.Y. Dec. 14, 2020) (citing *Lopes v. Heso, Inc.*,

No. 16-cv-6796, 2017 WL 4863084, at *2 (E.D.N.Y. Oct. 27, 2017)); *see also Francisco v. NY

Tex Care, Inc.*, No. 19-CV-1649, 2020 WL 3118528, at *2 n.3 (E.D.N.Y. June 12, 2020) ("As

noted in the R&R, courts are split on whether to allow a three- or six-year notice period for

FLSA collective actions, where the plaintiff alleges a willful FLSA violation, and where

violations of the NYLL, which provides for a six-year statute of limitations, are also alleged.").

"The recent trend 'is to approve three-year notice periods to avoid the confusion caused

by notifying plaintiffs who potentially have two disparate claims with different statutes of

limitations, along with the inefficiency of providing notice to plaintiffs whose claims may well

be time-barred." *Lubas v. JLS Grp., Inc.*, No. 18-CV-6611, 2020 WL 4210754, at *12 (E.D.N.Y.

July 22, 2020) (quoting *Gurrieri v. Cty. of Nassau*, No. 16-6983, 2019 WL 2233830, at *8

(E.D.N.Y. May 23, 2019)); *Gurrieri*, 2019 WL 2233830, at *8 ("The more recent trend,

however, is to 'approve the three-year notice periods.'").  However, courts have also been

mindful of the size of the potential class, finding a six-year notice period to be appropriate when

the class size would be small. *See, e.g.*, *Miranda v. Gen. Auto Body Works, Inc.*, No. 17-CV-

04116, 2017 WL 4712218, at *2 (E.D.N.Y. Oct. 18, 2017) ("Generally, courts are more apt to

grant a 6-year notice period when, as in this case, the potential class size is small and 'the notice

itself mitigates possible confusion.'" (quoting *Rojas v. Kalesmeno Corp.*, No. 17 Civ. 0164, at *6

(S.D.N.Y. July 19, 2017))).

In *Brown v. AvalonBay Communities*, a 2019 decision, this Court was presented with the

same issue raised in the instant case regarding the scope of the opt-in notice period.  *See Brown*

*v. AvalonBay Communities, Inc.*, No. CV 17-6897, 2019 WL 1507901, at *12 (E.D.N.Y. Mar.

29, 2019).  The Court previously determined that a three-year notice period was appropriate "[i]n

light of the scope of the collective . . . , which [would] potentially cover employees with thirteen

professional titles who are located in six different states." *Id.  Brown* is distinguishable from the

instant case where, as here, the scope of the collective covers employees with one professional

title -- home health aide coordinators -- who are based out of two locations in the same state.

Although the "recent trend" suggests the application of a three-year notice period, the *Lubas* and *Gurrieri* decisions omit from their analysis any discussion of the potential number of opt-ins. *See Lubas*, 2020 WL 4210754 at *12; *Gurrieri*, 2019 WL 2233830, at *8.  Notwithstanding, the Court notes that the number of potential opt-ins in both *Lubas* and *Gurrieri* appears to be much greater than what is foreseeable in the instant case.  *See Lubas*, 2020 WL 4210754 at *12 (certifying collective of former construction workers, roofers, and asbestos removers who worked at two different companies that employed more than 60 and 70 employees respectively during the notice period); *Gurrieri*, 2019 WL 2233830, at *8 (certifying collective of ambulance medical technicians, ambulance medical technician supervisors, and ambulance medical technician coordinators who worked for Nassau County).

Accordingly, the collective here is fairly limited in scope which justifies the application of a six-year notice period as opposed to a three-year period.  *See Brown*, 2019 WL 1507901, at *12 ("This case is different from other FLSA actions where the number of potential opt-in plaintiffs is small and readily ascertainable.  In such cases, a six-year limitations period may be appropriate."); *see also Cohan v. Columbia Sussex Mgmt., LLC*, No. 12-CV-3203, 2016 WL 1045532, at *2 (E.D.N.Y. Mar. 15, 2016) ("Courts have come to different conclusions when addressing the correct opt-in notice period when Plaintiffs assert both FLSA and NYLL claims in the same action. . . . Critically, however, decisions regarding the scope of the proposed notice are discretionary."); *Cano v. Four M Food Corp.*, No. 08-CV-3005, 2009 WL 5710143, at *10 (E.D.N.Y. Feb. 3, 2009) ("Even though district courts in this Circuit have granted both six and three year periods in similar cases, this Court finds it prudent and expedient in this case to allow a six-year period to apply, even if some recipients of the notice will have claims that are time-barred under the FLSA.  Since there may be a number of employees who have both timely state

and FLSA claims (such as named plaintiffs Cano and Ramirez and opt-in plaintiff Gonzalez),

and the number of potential plaintiffs is purportedly not very high, it seems logical, efficient, and

manageable to compel defendants' production of these names only once, if possible.").

### 3.    *Equitable Tolling*

Plaintiff requests that the statute of limitations be tolled "from the date of the filing of the

original letter motion until such time as the Court resolves this [formal] motion" that was made

on notice.  *See* Pl.'s Mem. at 23.  Defendant concedes that "the statute of limitations must only

be tolled to the date of the Court's decision and order" but misstates Plaintiff's position, arguing

that the Court should not permit tolling from the date of the filing of the Complaint.  *See* Def.'s

Opp'n at 9-10.

Under the FLSA, the statute of limitations applicable to a plaintiff's claim continues to

run until he or she has filed a written consent with the court to join the lawsuit.  *See* 29 U.S.C.

§ 256(b).  However, "[a] district court may toll the limitations period to avoid inequitable

circumstances."  *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 170 (S.D.N.Y. 2014) (citing

*Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 512 (2d Cir. 2002)).

"When determining whether equitable tolling is applicable, a district court must consider

whether the person seeking application of the equitable tolling doctrine (1) has 'acted with

reasonable diligence during the time period she seeks to have tolled,' and (2) has proved that the

circumstances are so extraordinary that the doctrine should apply."  *Zerilli-Edelglass v. N.Y.C.*

*Transit Auth.*, 333 F.3d 74, 80–81 (2d Cir. 2003) (quoting *Chapman*, 288 F.3d at 512).  Courts in

the Second Circuit "have permitted equitable tolling while the motion for conditional

certification is before the court."  *Fa Ting Wang*, 2015 WL 4603117, at *14 (citing *Robles*, 2013

WL 6684954, at *13); *McGlone*, 867 F. Supp. 2d at 445 (finding that potential plaintiffs "whose

putative class representatives and their counsel are diligently and timely pursuing the claims should also not be penalized due to the courts' heavy dockets and understandable delays in rulings").

In light of the length of time that has passed since the Plaintiff's initial letter motion for conditional certification was filed on March 5, 2020, and the relative diligence of Plaintiff's counsel in pursuing conditional certification, the Court is granting equitable tolling from the date the initial letter motion was filed.  *See Chui v. Am. Yuexianggui of LI LLC*, No. 18-CV-5091, 2020 WL 3618892, at *10 (E.D.N.Y. July 2, 2020) (granting equitable tolling from the date the motion was filed because of the "length of time that has passed since the instant motion was filed, and the diligence of Plaintiff's counsel in pursuing certification"); *Chime v. Peak Sec. Plus, Inc.*, 137 F. Supp. 3d 183, 188 (E.D.N.Y. 2015) ("Given Plaintiff's overall steadfast due diligence during the pendency of these motions, the balance of equities requires granting equitable tolling from September 9, 2013, the date Plaintiff filed the Motion to Certify.").

### 4.      *Dissemination of Notice*

Plaintiff seeks to distribute notice and reminder notices to potential opt-ins through mail, email and text message, and by posting such notices in the conference rooms at Defendant's Hempstead and Brooklyn locations.  *See* Pl.'s Mem. at 19-22.  Defendant argues that notice should not be emailed or text-messaged, but does not take a position regarding the mailing or the posting of such notices at either of Valucare's locations.  *See* Def.'s Opp'n at 7-9.

Courts in the Second Circuit "routinely approve email distribution of notice and consent forms in FLSA cases."  *Martin v. Sprint/united Mgmt. Co.*, No. 15-CV-5237, 2016 WL 30334, at *19 (S.D.N.Y. Jan. 4, 2016) (citing *In re Deloitte & Touche, LLP Overtime Litig.*, No. 11 Civ. 2461,  2012 WL 340114, at *2 (S.D.N.Y. Jan. 17, 2012)).  Courts have also approved text

message distribution of notice and consent forms where "the nature of the employer's business facilitated a high turnover rate among employees," *see id.*, and where text messaging is the employer's preferred method of employee communication. *See Bhumithanarn v. 22 Noodle Mkt. Corp.*, No. 14 Civ. 2625, 2015 WL 4240985, at *5 (S.D.N.Y. July 13, 2015)).

As justification for disseminating notice by email and text message, Plaintiff asserts that there was "prevalent communication between [her] and Defendant through cellular phones." *See* Pl.'s Mem. at 20; Pl.'s Reply at 8. However, the Gedeon Declaration and Complaint indicate that the extent of electronic communication between Plaintiff and Defendant was limited to emails. *See* Compl. ¶¶ 21, 35-36; Gedeon Decl. ¶ 8. In addition, Plaintiff does not advance an argument that the nature of Defendant's business facilitates a high turnover rate to warrant the distribution of notice by text message. Accordingly, the Court will permit Plaintiff to distribute the notice and reminder notice by email, but will not permit Plaintiff to distribute such notices by text message. *See Turban v. Bar Giocosa Corp.*, No. 19-CV-1138, 2019 WL 3817338, at *1 (S.D.N.Y. Aug. 14, 2019) (declining to approve text-message notice because the plaintiffs had not "sufficiently demonstrated that turnover and relocation by potential members of the collective [would] render mailed notice ineffective"); *In re Deloitte*, 2012 WL 340114, at *2 (allowing email notice because "communication through email is the norm"); *Pippins v. KPMG LLP*, No. 11 Civ. 0377, 2012 WL 19379, at *14 (finding email notice appropriate "given the reality of communications today"). Plaintiff's unopposed requests to disseminate the notice and reminder notice by mail and for Defendant to post the notices in conspicuous places in the conference rooms at both of its locations where home health aide coordinators attend meetings twice per day are also granted. *See Castillo v. Perfume Worldwide Inc.*, No. 17-CV-2972, 2018 WL 1581975, at *17 (E.D.N.Y. Mar. 30, 2018) ("Courts regularly approve plaintiffs' requests to

post notices and consent forms in 'non-public areas' where potential collective members are likely to congregate, such as clock-in stations or break rooms.").

### 5.    *Contents of the Proposed Notice and Consent Forms*

Defendant argues that Plaintiff should not be permitted to distribute the Notice and Consent forms until after the parties have had an opportunity to meet and confer regarding the language to be utilized.  *See* Def.'s Opp'n at 9.  Defendant then raises two issues regarding the contents of the Notice:  (1) there is no mention that Defendant is represented by counsel, thus, Defendant's counsel is not identified in the Notice; and (2) "the proposed Electronic Notices[] provide for an unidentified URL address and constitute direct and live communications with the proposed collective."  *Id.*  In response, Plaintiff argues that Defendant's request for a meet and confer should be denied, defense counsel's contact information is not relevant for effective notice distribution, and that the URL link is proper as it "would merely direct potential opt-in plaintiffs to the notice hosted on counsel's website."  *See* Pl.'s Reply at 8-9.

Courts within this Circuit are split as to whether an opt-in notice should include defense counsel's contact information:

> There is a divide of authority on whether defense counsel's contact information should be included in an opt-in notice.  On one hand, "[c]ourts in this Circuit have generally concluded that such information is appropriate for inclusion in a notice of collective action."  The basis for this conclusion has not always been made clear, but one reason that has been given is that the "information is necessary to afford employees the opportunity to communicate with defense counsel."  On the other hand, some courts have concluded that "it is appropriate that defendants' counsel not be listed as contacts on the form of notice" because between plaintiffs' counsel and defendants' counsel, "[o]nly plaintiffs' counsel can potentially represent the individuals to whom the notice is mailed, and only they should be privy to certain sensitive information that may otherwise fall within the attorney-client privilege."

*Jibowu v. Target Corp.*, No. 17-CV-3875, 2020 WL 7385695, at *4 (E.D.N.Y. Dec. 16, 2020) (first quoting *Anjum v. J.C. Penny Co.*, No. 13-CV-460, 2015 WL 3603973, at *14 (E.D.N.Y. June 5, 2015); then quoting *Guo v. Tommy's Sushi, Inc.*, No. 14-CV-3964, 2014 WL 5314822, at *4 (S.D.N.Y. Oct. 16, 2014); and *Chhab v. Darden Rests., Inc.*, No. 11-CV-8345, 2013 WL 5308004, at *16 (S.D.N.Y. Sept. 20, 2013)) (citations omitted) (alterations in original). However, "[c]ourts in this Circuit have generally concluded that such information is appropriate for inclusion in a notice of collective action." *See Slamna v. API Restaurant Corp.*, No. 12-CV-757, 2013 WL 3340290, at *5 (S.D.N.Y. July 2, 2013); *see also Moses v. Griffin Indus., LLC*, No. 18-CV-1200, 2020 WL 5813737, at *4 (S.D.N.Y. Sept. 30, 2020) ("The notice should include contact information for defense counsel."). Accordingly, the Court will require the inclusion of contact information for Defendant's counsel in the notice. The parties are directed to meet and confer regarding the inclusion of this information in the notice and are advised to review *Jibowu v. Target Corp.* which sets forth language that was deemed "unlikely to create confusion, render notice less effective, or implicate concerns of attorney-client privilege." *See Jibowu*, 2020 WL 7385695, at *4-5.

Regarding Defendant's concern as to the inclusion of an "unidentified URL address" in the proposed electronic notices, the Court notes that the URL would only be included in the proposed Text Message Notice of Lawsuit. *See* Text Message Notice of Law Suit [DE 28-7]. The Email Notice of Lawsuit does not refer potential opt-ins to any URLs. *See* Email Notice of Lawsuit [DE 28-6]. In light of the Court's ruling that notice may not be disseminated via text message, *see supra* Section IV.B.4, this issue is moot.

### C.     Production of Identifying Information

Plaintiff requests that Valucare produce the following identifying information for potential collective members:  "A computer-readable data file containing the names, last known mailing addresses, all known home and mobile telephone numbers, all known email addresses, work locations, and dates of employment of all potential collective action members who worked for Defendant at any point from December 11, 2013 to the present."  *See* Pl.'s Mem. at 18.  Defendant's arguments against producing identifying information are scattered throughout its Opposition.  Defendant claims that it should not be required to produce telephone numbers and email addresses, and that there is "no reason to permit Plaintiff to obtain information for employees going back six years without first requiring them to prove the more stringent standard of class certification under Fed. R. Civ. P. 23 and the NYLL."  *See* Def.'s Opp'n at 6, 8-9.

"Courts, when conditionally certifying a collective action, often grant requests for potential plaintiffs' 'names, last known addresses, telephone numbers (both home and mobile), email addresses, and dates of employment' from the defendants."  *Dilonez v. Fox Linen Serv. Inc.*, 35 F. Supp. 3d 247, 258 (E.D.N.Y. 2014) (quoting *Puglisi*, 998 F. Supp. 2d at 102).  In light of the Court's finding that the applicable notice period is six years, and that courts often require FLSA defendants to produce the information sought by Plaintiff, Plaintiff's request for contact information is granted.  *See id.* at 258 (ordering the production of contact information for employees who worked for defendants within the six years prior to the filing of the complaint).  Defendant shall provide this information to Plaintiff within twenty-one (21) days of entry of this Order.

V.    CONCLUSION

 For the foregoing reasons, Plaintiff's motion for conditional certification as an FLSA

collective action pursuant to Section 216(b) is GRANTED, in part, and DENIED, in part, subject

to the limitations discussed in this Memorandum and Order.  In sum, the Court certifies the

following collective action:  All current and former employees who worked for Valucare, Inc. as

home health aide coordinators at any time between December 11, 2013 and the present.  The

Court further Orders that:

1.  Within twenty-one (21) days of entry of this Order, the parties are to meet and confer in

    good faith and submit a revised "Court Authorized Notice of Lawsuit" [DE 28-4] that

    complies with the directives set forth above; and

2.  Within twenty-one (21) days of entry of this Order, Defendant shall produce a computer-

    readable data file including the names, last known mailing addresses, known home and

    mobile telephone numbers, known email addresses, work locations, and dates of

    employment for members of the putative collective.

                                                      **SO ORDERED.**


Dated: Central Islip, New York
       March 31, 2021                          /s/ A. Kathleen Tomlinson
                                               A. KATHLEEN TOMLINSON
                                               U.S. Magistrate Judge